UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LC TECHNOLOGY
INTERNATIONAL, INC.,

       Plaintiff,

vs.                                                              CASE NO.: 8:03-cv-2493-T-MAP

MEDIARECOVER, LLC,

       Defendant/Third
       Party Plaintiff,

vs.

DAVID ZIMMERMAN,

       Third Party
       Defendant.

_____/

## **ORDER**

      Alexander Grau is a developer of a digital image recovery source code.  A non-party to this action, Grau licensed his source code to two competing software distributors, Plaintiff LC Technology International, Inc. ("LCT") and Defendant MediaRECOVER, LLC.  Although both licenses overlapped in time, LCT sued MediaRECOVER for infringing LCT's "exclusive license," publicized its action with a press release stating MediaRECOVER had "pirated" source code, and sent that notice to several of MediaRECOVER's customers.  MediaRECOVER, in turn, filed counterclaims against LCT for defamation per se, tortious interference with contract and business relationships, and unfair competition, and brought third-party claims against LCT's president (David Zimmerman) for defamation per se, tortious interference, concert of action, and civil conspiracy.  After a non-jury trial, I find that LCT's claim is without any legal basis.  I further find that LCT and

Zimmerman are liable for defamation per se and tortious interference with business relationships,

LCT is liable for unfair competition, and MediaRECOVER is entitled to $157,500 in damages.

Accordingly, the Clerk is directed to enter judgment for MediaRECOVER.[1]

## A. Findings of Fact

Programmers initially write computer programs using source code, a human-readable

language using words and common mathematical symbols. Source code is run through a compiler

to produce object code, a computer-readable series of 1s and 0s. *See Bateman v. Mnemonics, Inc.*,

79 F.3d 1532, 1539 n.17 (11th Cir. 1996).   Object code is then joined with other components to

produce machine code.  "Digital image recovery" software is a generic term for programs designed

to recover digital images that a computer user may have accidentally or intentionally deleted or

corrupted.  Both LCT, a Florida corporation, and MediaRECOVER, an Iowa firm, distribute such

products.

Alexander Grau, a resident of Germany, apparently developed a source code for a digital

image recovery software program.[2]  Grau named his program "Digital Image Recovery," despite

acknowledging that term applies generically to the process of recapturing lost digital files.

Nonetheless, he claims some property interest, like that of a brand or mark, in the use of "Digital

Image Recovery" because he has capitalized the first letter in each word.[3]

On June 10, 2002, Korey Bachelder, as the sole owner of "Flashcardfix," purchased a license

---

[1]  The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) (doc. 208).  I make these findings per the requirements of FED. R. CIV. P. 52(a).

[2]  The use of the term, "apparently," is purposeful.  Frankly, it is unclear from the evidence if Grau initially developed this source code or obtained it through the internet.

[3]  LCT has not pled nor even remotely alleged a trademark infringement action under the Lanham Act.  *See* 15 U.S.C. § 1051 *et seq.*

to use Grau's source code identified as "Digital Image Recovery 1.47." *See* Defendant's ex. 8.  This was not Grau's first sale of the code, and Bachelder knew this.  Grau admitted he had sold a couple of licenses to others in Spain and the United Kingdom.  Nonetheless, Bachelder's license authorized the licensee "to use, to translate, to modify the source, create derived works and to sell them."  And its term was "for unlimited sales in time and units."  The licensee could not, however, distribute programs under the names "Drive Rescue" or "Digital Image Recovery."  When Bachelder later formed MediaRECOVER, LLC, he assigned the license to that entity (effective June 4, 2003).  Bachelder is MediaRECOVER's president, owner, and only employee.

On August 13, 2002, just two months after issuing Bachelder's license, Grau entered into a license agreement with LCT, one that LCT claims gives it "an exclusive worldwide right and license" over the same source code.  Notably, LCT's so-called "exclusive" license agreement with Grau does not mention Digital Image Recovery 1.47, the source code identified in Bachelder's license; instead, LCT's agreement references the "product," "PHOTORECOVERY."[4]  Like he did with Bachelder, Grau informed Zimmerman beforehand that others already held licenses to Grau's source code.  Using Grau's source code, LCT developed software, which it marketed under the label, "PHOTORECOVERY."

In late January 2003, Zimmerman e-mailed Bachelder asserting LCT's "exclusive rights" to Grau's code and demanding Bachelder stop selling MediaRECOVER Image Recovery Software.  The next month, Grau and Zimmerman, as evidenced by a series of e-mails, formulated a plan to terminate Bachelder's license on the grounds that Bachelder used the term, "digital image recovery,"

---

[4]  LCT previously had a license with Grau dated June 10, 2002, that did reference Digital Image Recovery 1.47, but this license, like Bachelder's, was not exclusive.

in distributing MediaRECOVER's software.  When Grau, who noted he had not registered the name, "Digital Image Recovery," questioned this strategy, Zimmerman disagreed:  "Sure, if he [Bachelder] signed a contract stating he will not distribute under the name of 'Digital Image Recovery,' then we can look to close him down."  When Grau doubted whether a lawsuit against Bachelder would have a chance because "Digital Image Recovery" is a term like "Data Recovery or Windows," Zimmerman opined optimism – a lawsuit would have a "good chance" of success.  Zimmerman added, "I don't even think we should give him a warning to stop using the name."

Premised on Bachelder's use of "Digital Image Recovery," Grau wrote Bachelder a letter in late February purporting to terminate their June 10, 2002, license agreement.  Grau ended with a warning: "Provided we receive no answer until March 11 we assume your acceptance to this termination."  *See* Defendant's ex. 19.  On March 5, 2003, Bachelder replied with an e-mail (which Grau claimed he did not receive) objecting he had not received fair warning of the termination.  Further, he offered to remove any reference to "digital image recovery," explaining he had used "digital image recovery" only as a descriptive term and not as the proper name of the software.  Indeed, MediaRECOVER thereafter removed the words "digital image recovery" from its packaging cover.

That same month, Bachelder hired TheDevShop, a programming firm in Thailand, to write digital recovery code without applying Grau's source code, a project that took the Thai programmers less than two weeks to accomplish.  Furnished with the new code, Bachelder informed LCT's attorney (Thomas Jennings) on April 2, 2003, that MediaRECOVER no longer used Grau's source code nor the "descriptive title," "Digital Image Recovery."  Consequently, Bachelder considered any dispute resolved.  LCT, however, pressed on.  In September 2003, LCT had Grau compare

4

MediaRECOVER's software with his Digital Image Recovery software.  Grau noticed the same program error and the same driver file.  Without ever examining MediaRECOVER's source code, much less comparing it to his, Grau concluded the programs were the same.

Relying only on Grau's opinion, LCT filed this action against MediaRECOVER.  In a companion press release issued on October 31, 2003, for "immediate release," LCT "accused" MediaRECOVER of "Stealing Vital Code from PHOTORECOVERY for Digital Media."  The notice, which Zimmerman authored, claimed LCT's "accusations of copyright infringement were confirmed by analysis prior to the filing of the lawsuit."  Zimmerman added that LCT "launched this lawsuit reluctantly."  Nonetheless, he accused MediaRECOVER of "knowingly pirating vital software code," "stealing code from PHOTORECOVERY," and "knowingly using illegal source code."  Issued on company letterhead, LCT invited those seeking more information to go to its website.  *See* Defendant's ex. 37.  Zimmerman, besides sending the publication to a news wire service, ensured LCT's claims obtained targeted publication by distributing the release directly to six or seven companies, including several MediaRECOVER clients.[5]

Although LCT's complaint states that "MediaRECOVER Image Recovery Software infringes on the copyright for PHOTORECOVERY by using substantial segments of software code from PHOTORECOVERY and Digital Image Recovery," *see* Complaint, doc. 2, at ¶ 9, LCT has

---

[5]  As underscored, LCT premised its copyright-infringement conclusion solely on Grau's comparisons of the two programs, an analysis that is legally specious.  Even assuming that Grau had a valid copyright to the source code and his license to LCT authorized LCT to enforce Grau's copyright interests, LCT still had no basis to make a copyright infringement claim against MediaRECOVER.  To prove copyright infringement, a side-by-side comparison must be made between the original source code and the copy.  *See General Universal Systems, Inc. v. Lee,* 379 F.3d 131, 146 (5th Cir. 2004) (granting summary judgment for defendant because source codes were not compared).

repeatedly since denied such a claim.  *See* LCT's Response to Motion for Partial Summary Judgment at doc. 38 ("LC Technology did not sue for copyright infringement."); LCT's Response to MediaRECOVER's Motion for Partial Summary Judgment at doc. 118 (same); and Joint Pretrial Statement at doc. 181 ("LC Technology claims that all it seeks is to protect its contractual rights as the exclusive licenser (*sic*) of software, not for copyright infringement").  Zimmerman maintained this stance at his deposition.[6]  Based on all this, the district judge denied MediaRECOVER's motion for partial summary judgement.  *See* doc. 141 ("[T]here is undisputed testimony that the claim is not for copyright infringement.  Because there is no claim for copyright infringement, the Court denies the Motion for Partial Summary Judgment on that issue.").  Yet, LCT's publicly promoted description of the lawsuit contradicted its legal one.  Its press release accusing MediaRECOVER of copyright infringement and "knowingly using illegal source code" remained on its website through the trial (a website that according to Zimmerman receives an estimated 10,000 hits each month).

LCT's actions impacted MediaRECOVER financially; however, quantifying the amount proves problematic because MediaRECOVER, in the main, lost potential customers whose deals offered possibly lucrative deals if finalized.  ProMaster, a distributor for MediaRECOVER, cancelled an order for $7,500 after receiving a "fax about the litigation."  Digital Workshop, another customer, likewise cancelled an order.[7]  Instead, Digital Workshop opted for LCT's

---

[6]  MediaRECOVER's counsel asked Zimmerman: "So, you are not making any claim for copyright infringement against MediaRECOVER?"  He responded: "For copyright, no.  This is for a License Agreement violation."

[7]  Digital Workshop cancelled its order days before the press release issued based on communications from LCT.

PHOTORECOVERY software because MediaRECOVER's software had been "lifted" from another company's software thereby exposing Digital Workshop to a "shady" situation.  Digital Workshop estimated it would sell 10,000 units at $10.50 per unit, for a total figure of $105,000.  In April 2004, MediaRECOVER had all but finalized an agreement with Digital Innovations, a deal that could have netted MediaRECOVER potentially $1,719,260 in sales.  Digital Innovations, however, refused to sign the agreement citing a lack of trust occasioned by the press release's revelations.

    *B.  Conclusions of Law*

        *1. LCT's claim has no legal basis*

Notwithstanding its constant refrain that this is not a copyright infringement action, LCT relies only on copyright law and copyright cases for support: 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."); *Essex Music, Inc. v. ABKCO Music and Records, Inc.*, 743 F. Supp. 237, 241 (S.D.N.Y. 1990) ("Plaintiff as an exclusive licensee has the right to institute an action for copyright infringement."); and *Tang v. Hwang,* 799 F. Supp. 499, 502 (E.D. Pa.1992) (stating that where a party was granted an exclusive license to reproduce and distribute videos, the party did have "exclusive rights which may be protected from infringement under the copyright laws.").  *See* LCT's Proposed Findings of Fact and Conclusions of Law, doc. 221, at 6.  These cases are inapposite, and LCT's murky legal theory positing some sort of "exclusive license" infringement is without merit.  In short, despite repeated calls by the Court for clarity, LCT never defined its claim with any lucidity.[8]

---

    [8] Moreover, even if LCT were attempting to assert a claim for copyright infringement, LCT would lack standing.  Although Grau purported to grant LCT an "exclusive" license, the license was not in fact exclusive, since LCT was aware at the time it entered into the license agreement that

LCT asserts  its "exclusive license" action is grounded on state law.  Notably absent, however, is any plausible legal authority supporting that contention.  Irrespective, state causes of action are preempted by federal copyright law unless they are qualitatively different from the rights granted under the Copyright Act.  *See Bateman,* 79 F.3d at 1550 (recognizing that "artful pleading and presentation of evidence seemingly may create a pendent state law claim that in actuality is nothing more than a dressed up version of a copyright infringement claim," and scrutinizing plaintiff's state law trade secret claim to ensure that the claim was "*qualitatively* different from a copyright infringement claim"); 17 U.S.C. § 301 (providing that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title.").  Regardless of LCT's labeling, its action against MediaRECOVER remains essentially one for copyright infringement, and simply "dressing it up" as one under state law does not alter its true nature.  To survive preemption, LCT's action must include an additional element beyond mere copying.  *See Bateman*, 79 F.3d at 1549 (noting that state law trade secret claims generally are not preempted by 17 U.S.C. § 301 because the plaintiff must prove an extra element – the existence and breach of a confidential relationship); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc*., 903 F.2d 1486, 1494 (11th Cir. 1990) ("A claim for unfair competition based upon allegations of copying, and in the absence of proof of any element of unfair competition other than copying, is clearly pre-empted by the Act.").  LCT clearly has not articulated a state cause of action requiring an additional element for recovery.  Dressed down, LCT's suit shows copyright.

---

others – including Bachelder – held licenses to Grau's source code.  A non-exclusive licensee lacks standing to bring an action for copyright infringement.  *See Swarovski America Ltd. v. Silver Deer Ltd.*, 537 F. Supp. 1201, 1205 (D. Colo. 1982) ("The licensor of non-exclusive rights retains standing to sue while the non-exclusive licensee has none."); *see also* 3 Nimmer on Copyright § 12.02[B].

*See* Complaint (doc. 2) at ¶ 9 ("MediaRECOVER Image Recovery Software infringes on the copyright for PHOTORECOVERY by using substantial segments of software code from PHOTORECOVERY and Digital Image Recovery.").

Despite the incongruity of its claimed cause of action with its stated legal grounding, LCT maintains that MediaRECOVER failed to comply with the terms of the license agreement between MediaRECOVER and Grau (thus justifying Grau's alleged termination of the license). In short, it tries to make a copyright claim into a breach of contract claim. But LCT ignores it lacks standing to sue for breach of the agreement between MediaRECOVER and Grau. *See Gallagher v. Dupont,* 918 So. 2d 342, 347 (Fla. 5th DCA 2005) ("A person not a party to nor in privity with a contract has no right to enforce it."). I therefore find that LCT has no basis for recovery against MediaRECOVER.[9]

*2. LCT and Zimmerman's press release constituted libel per se*

The elements of a defamation claim are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication." *Rapp v. Jews for Jesus*, *Inc.*, 944 So. 2d

---

[9] LCT misconstrues the basics of licensing and claims expansive rights Grau's license does not give to it. "All licenses are merely instruments through which the licensee receives from the licensor, for an agreed upon consideration, the right to enjoy something the licensor has the right to grant, without interference by the licensor." *See* 1 ECKSTROM'S LICENSING IN FOR. & DOM. OPS. § 1:1. The license agreement does not give LCT the right to sue for infringement. Even if the agreement had contained a "right to sue" clause, this would not confer standing on LCT because LCT was a nonexclusive licensee. *See Ortho Pharm. Corp. v. Genetics Inst., Inc*., 52 F.3d 1026, 1034 (Fed. Cir. 1995) (holding in a patent case that the existence of a "right to sue" clause could not confer standing on a nonexclusive licensee). Courts recognize a "historic kinship between patent law and copyright law." *Sony Corp. of America v. Universal City Studios, Inc*., 464 U.S. 417, 439 (1984).

460, 464–65 (Fla. 4th DCA 2006).  A statement is defamatory if it "tends to harm the reputation of

another as to lower him or her in estimation of community or deter third persons from associating

or dealing with the defamed party."  *Mile Marker, Inc., v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841,

845 (Fla. 4th DCA 2002).  Libel is the category of defamation consisting of written statements.

*Rapp*, 944 So. 2d at 465.  A statement is libelous per se if "when considered alone without innuendo,

it tends to subject one to hatred, distrust, ridicule, contempt or disgrace, or tends to injure one in his

trade or profession …, or if it imputes to another conduct, characteristics, or a condition

incompatible with the proper exercise of his lawful business, trade, profession, or office."  *Barry*

*College v. Hull*, 353 So. 2d 575, 578 (Fla. 3d DCA 1977); *Drennen v. Westinghouse Elec. Corp.*

328 So. 2d 52, 54 (Fla. 1st DCA 1976).  In a case of libel per se, malice is presumed, *see Wolfson*

*v. Kirk*, 273 So. 2d 774, 777 (Fla. 4th DCA 1973), and the law does not require proof of special

damages, *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1352 (M.D. Fla. 2006)

(applying Florida law).[10]

Libel claims also raise constitutional concerns.  First Amendment law distinguishes between

private individuals and public figures.  *See Long v. Cooper*, 848 F.2d 1202, 1204 (11th Cir. 1988).

While a private figure may recover damages if the publisher negligently made the false statement,

a public figure must demonstrate actual malice – that the publisher either knew the statements were

---

[10]  Common law malice must be distinguished from "actual malice," the constitutional standard that requires a public figure plaintiff to demonstrate by clear and convincing evidence that the defendant realized the statement was false or acted with reckless disregard as to whether the statement was true or false.  *See Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) ("Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice.'"); *Straw v. Chase Revel, Inc*., 813 F.2d 356, 362 (11th Cir. 1987) (discussing the difference between common law malice and the constitutional standard of actual malice).

false, or acted with reckless disregard of whether the statements were true or false.[11]  *See Mile Marker, Inc. v. Petersen Publishing*, L.L.C., 811 So. 2d 841, 845 (Fla. 4th DCA 2002).  There are two classes of public figures – general public figures and limited public figures.  General public figures "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes."  *Silvester v. American Broadcasting Companies, Inc*., 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 345 (1974)).  Limited public figures have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Id.* at 1494 (quoting *Gertz* at 418 U.S. at 345).  It is clear that MediaRECOVER does not enjoy the sort of persuasive power and influence that would make it a general public figure.  The question, then, is whether MediaRECOVER is a limited public figure.

In analyzing whether a party is a limited public figure, the Eleventh Circuit has adopted a three-part test, in which a court must "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'"  *See Long*, 848 F.2d at 1204.  When a company engages in only "normal advertising practices," it has not attempted to thrust itself into a controversy for purposes of the second prong of this test.  *Id.* at 1205.  MediaRECOVER is a small company

---

[11]  Although neither Zimmerman nor LCT has argued that MediaRECOVER is a public figure, I nonetheless consider the issue because the First Amendment imposes the minimum threshold a plaintiff must prove in order to recover damages for defamation.  *See Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1329 n.5 (5th Cir. 1993) (Where the defendant failed to raise the First Amendment as an affirmative defense, the court rejected the argument that the defendant had waived any claim that the actual malice rule applies, stating that the "First Amendment imposes on libel plaintiffs the burden of proving that the defendant's conduct satisfies a certain standard of fault; it does not create an affirmative defense that must be pled."); *see also* Fla. Std. Jury Instr. (Civ.) §§ MI 4.1 and 4.3 (distinguishing between public figure claimants and private claimants).

with only one employee, and the record is devoid of any advertising practices or other behavior by which MediaRECOVER thrust itself into a public controversy.  The publicity MediaRECOVER received due to the press release does not make MediaRECOVER a public figure, since "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).  Thus, I conclude that MediaRECOVER is a private figure in the constitutional sense.  *See Long*, 848 F.2d at 1205; *see also Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1329–30 (5th Cir. 1993) (where corporations were not the sort likely to become "household names" and where the record contained no evidence that the corporations "received significant past publicity," the court treated the corporations as private figures).  Because MediaRECOVER is a private figure, it need only demonstrate that the statements were made negligently, that is, without reasonable care as to whether the statements were actually true or false. *Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376, 378 (Fla. 3d DCA 1982).

In claiming that the statements in the press release are true, LCT avoids proving the core of its claim – that MediaRECOVER copied PHOTORECOVERY's source code.  Instead, LCT contends that MediaRECOVER did not hold a valid license to use Grau's code, either because the license was not effectively assigned to MediaRECOVER, or because Grau's February 27, 2003, letter effectively terminated the license.  For the reasons already stated, these positions are without legal merit.  But even presuming some legal viability, the press release remains grossly inaccurate. It does not refer to Grau at all; rather, its headline accuses MediaRECOVER of "stealing vital code" from LCT's PHOTORECOVERY software.[12]

---

[12]  The press release does not challenge MediaRECOVER's use of the code based on an ineffective assignment of the license from Grau. Indeed, LCT had no basis to even question the effectiveness of the assignment until well after issuing the press release, based on documents

Besides, even if Zimmerman subjectively believed that the statements in the press release were true, this is not a defense to MediaRECOVER's libel claim. Under Florida law, truth is only a defense to a libel claim when truth is coupled with a good motive. *LRX, Inc. v. Horizon Associates Joint Venture ex rel. Horizon-ANF, Inc.*, 842 So. 2d 881, 886 (Fla. 4th DCA 2003); *see also Drennen*, 328 So. 2d at 55 ("[T]ruth, in and of itself, is not a complete defense in an action for defamation, but truth coupled with good motives is."). Zimmerman has not demonstrated that he acted with good motives.

LCT's charge in its press release – that MediaRECOVER stole code from a competitor – is much more inflammatory and damaging to MediaRECOVER's reputation than the assertion that MediaRECOVER used Grau's code after Grau allegedly terminated the license. But even this latter accusation is untrue. After Bachelder received Grau's termination letter and before Grau's deadline, Bachelder hired TheDevShop to recode the software and put out a different recovery program. In short, LCT has failed to prove the truth of its legally unacceptable theory. Nor did it prove the clear implications of its other press-release claims: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *See Bateman*, 79 F.3d at 1541 (listing the

---

MediaRECOVER produced through discovery. Even LCT's complaint recognizes MediaRECOVER as a "former licensee" of Grau's source code. *See* Complaint (doc. 2) at ¶ 6. Grau himself never objected to the assignment, and LCT lacks standing to assert Grau's legal rights. In any event, I find that license allegedly issued to Bachelder, and even though Flashcardfix is listed as the company name, the license does not limit the use of the code to Bachelder's work with Flashcardfix. Although the press release does make reference to the alleged termination, stating "they violated a license they legally had to use source code under our control and had their license terminated," it fails to clarify that the license allegedly violated was with Grau. Regardless, this statement is buried under the much more inflammatory accusations of "stealing vital code" and "knowingly pirating vital software code." Because I conclude that MediaRECOVER no longer used Grau's code after March 11, 2003, I need not reach the issue of whether the termination was effective. Moreover, issues relating to the effectiveness of the termination are more properly litigated between Grau and MediaRECOVER, since LCT was not a party to that contract.

elements of copyright infringement).

MediaRECOVER's expert compared the source code of MediaRECOVER, LCT's PHOTORECOVERY, and Grau's Digital Image Recovery.  He determined that although the programs were "functionally equivalent" – in other words, performed the same functions in similar ways – they were not copies of one another.  The programs were written in different programming languages (MediaRECOVER in C++ and PHOTORECOVERY in DELPHI), had no common function names, had no common programmer comments, had different structures (MediaRECOVER used a simple structure while PHOTORECOVERY had a more complex structure), and had different programming styles (with MediaRECOVER using a more simple style without foreign language support and PHOTORECOVERY using a more complex style with foreign language support). He also testified that when one program is copied from another, the copy is generally larger than the original, because the programmer doing the copying would be hesitant to remove parts of the program that he or she did not understand.  In this case, MediaRECOVER was smaller (2 MB) than PHOTORECOVERY (38 MB).[13]

The statements in the press release constitute libel per se because they accuse MediaRECOVER of conduct "incompatible with the proper exercise of [its] lawful business."

_____

[13] LCT's trial expert never compared Grau's source code with MediaRECOVER's, a fact that makes his testimony largely irrelevant under Fed. R. Evid. 702 and 401.  *See General Universal Systems, Inc. v. Lee,* 379 F.3d 131, 146 (5th Cir. 2004) (granting summary judgment for defendant because source codes were not compared) and note 5, *infra*.  In contrast, MediaRECOVER's expert, whom I found persuasive, implied Grau's work was not particularly original.  Applications for the recovery of digital files had existed for some time, and the expert had noticed variations of Grau's source code on the internet.  A driver file for Grau's source code and one that MediaRECOVER's program included (int2f.vxd) was available from the internet according to MediaRECOVER's expert.  He also noted this commonality was less than one percent of the total code.

*Drennen,* 328 So. 2d at 54; *see also Army Aviation Heritage Found. and Museum Inc., v. Buis*, 2007 WL 951804 at *1 (N.D. Fla. 2007) ("A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se."); *Gardner v. Senior Living Sys., Inc.*, 731 N.E.2d 350, 356 (Ill. App. Ct. 2000) (determining that accusations of "software piracy" and "theft of trade secrets" were defamatory per se).   And Zimmerman and LCT are each liable for the defamation.  Zimmerman drafted the press release on behalf of LCT, directed that it be issued on LCT letterhead, had it posted on the LCT website, and invited readers to contact LCT for additional information.  These are sufficient grounds to hold LCT liable.  *See Rety v. Green*, 546 So. 2d 410, 425 (Fla. 3d DCA 1989) (holding corporation liable where the defamatory letter was sent out on corporate stationary, was signed by the corporation's president, and was sent out for a business purpose).  Zimmerman is also liable because under Florida law "[i]ndividual officers and agents of a corporation are personally liable where they have committed a tort even if such acts are performed within the scope of their employment or as corporate officers or agents."  *Scutieri v. Miller*, 605 So. 2d 972, 973 (Fla. 3d DCA 1992) (holding that corporate officers could be liable for defamation, even when the defamation action against the corporation had been settled).

*a.  general and special damages*

Florida law recognizes two categories of compensatory damages recoverable in defamation actions – general damages and special damages.  *See Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977).  General damages are "those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander."  *Id.*

15

General damages "are allowable whenever the immediate result is to impair the plaintiff's reputation, although no actual pecuniary loss is demonstrated." *Id.* The law gives little guidance for determining the amount of compensatory damages in such instances other than any award should be "fair and just" in light of the evidence presented. *See Army Aviation,* 2007 WL 951804 at *2. "All awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 350 (1974). Special damages, on the other had, are "actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers, … all expressed in figures." *Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999). Such damages "do not result by implication of law from a wrongful publication," and a plaintiff must demonstrate that the special damages "proximately resulted from the defamation." *Bobenhausen*, 344 So. 2d. at 281. A business, like an individual, can suffer harm to its reputation, and in a case of defamation per se, can recover general damages for that harm, even without proof of special damages. *See Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.*, 378 F.2d 377, 383 (5th Cir. 1967) (applying Florida law) ( "[W]here a libel contains an imputation upon a corporation in respect to its business, its ability to do business, and its methods of doing business, the same becomes libelous per se, and that special damages need not be alleged … [When a statement is libelous per se,] the law presumes that some damage will flow in the course of things from the mere invasion of plaintiff's rights and calls it general damage, which need not be proved by evidence, and in such a case there is no necessity that plaintiff show special

damage.").[14]

MediaRECOVER, a one-man company without any proven financial track record, seeks $4,000,000 in damages. Most of this depends on finding special damages due to lost business opportunities. But MediaRECOVER's special damage proof is speculative with the bulk resting on an anticipated deal with Digital Innovations, a contract that was in the works but not yet signed when Digital Innovations backed out. And, even if it had been finalized, Digital Innovations's financial obligations are unclear and the monies MediaRECOVER could have made vary widely. Had Digital Innovations, according a proposed agreement, purchased the software per paragraphs 2, 4, 5, and exercised the options in paragraph 18, Digital Innovations would have owed MediaRECOVER as much as $1,719,260. But if Digital Innovations had declined to exercise the paragraph 18 options, or if Digital Innovations had terminated the deal, the contract could have been worth $620,280 or less. Regardless of these permutations, MediaRECOVER presented no evidence about its costs. And while the contract implies MediaRECOVER's costs may not have been extensive, it clearly would have incurred some costs, such as the costs to "periodically update and upgrade the software to correct bugs and address customer service issues" (*see* Defendant's ex. 47 at ¶ 14). This same reasoning applies to MediaRECOVER's dealings with Digital Workshop, a distributor that optimistically predicted as much as $105,000 in sales. Whether that was likely is uncertain; furthermore, MediaRECOVER did not outline the costs it would have incurred in fulfilling its part of the bargain.

MediaRECOVER's speculative deals are fatal when asking for special damages. When a

---

[14]   Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding precedent on federal courts within the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

company seeks to recover lost profits due to the defendant's libel, the lost profits must be proven to a "reasonable degree of certainty, based on proof of income and expenses for a reasonable period of time before the libel occurred." *Tennant v. Vazquez*, 389 So. 2d 1183, 1183 (Fla. 2d DCA 1980). "If the party presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages relating to lost profits will be reversed." *Clayton v. Howard Johnson Franchise Systems, Inc*., 954 F.2d 645, 652 (11th Cir. 1992). However, its deal with ProMaster meets the special damages threshold because MediaRECOVER's damages of $7,500 are reasonably certain in view of ProMaster's purchase order and MediaRECOVER's production run.

MediaRECOVER's general damages are a different matter. Undoubtedly, LCT and Zimmerman's libelous statements impugned MediaRECOVER's business reputation and the integrity of its intellectual property.[15] Some of its former customers stopped doing business with it; anticipated customers, particularly a potentially lucrative one, no longer expressed interest and looked elsewhere. Admittedly, MediaRECOVER continued to do business after the press release and earned more each year.[16] Yet, it stood to earn considerably more and the future looked particularly bright for such a young enterprise. In light of the inflammatory nature of the accusations in the press release made without any legal basis, I find $150,000 in general damages to be fair and just.

---

[15] A corporation's reputation is not like an individual's. A false publication, however, can injure a corporation's credit, property, or business. When viewing that particular damage, the test is not different from that which would be applied in determining whether an individual's business reputation has been defamed. *See Diplomat Electric, Inc., supra,* at 378 F.2d at 381.

[16] Bachelder estimated MediaRECOVER's sales to be $140,000 in 2003, $210,000 in 2004, and $240,000 in 2005. In contrast, Zimmerman stated LCT had $4 million in sales last year.

### b.  punitive damages

MediaRECOVER also seeks punitive damages in an amount of three times the actual damages.  To support an award of punitive damages in a libel action, Florida law requires proof of ill will, hostility, or an evil intention to defame and injure; however, the fact-finder can deduce these elements either from the evidence produced at trial, or from the character of the publication itself. *Matthews v. Deland State Bank*, 334 So. 2d 164, 166 (Fla. 1st DCA 1976).  Even if the elements authorizing an award of punitive damages are present, an award of punitive damages is discretionary.  *See Bankers Multiple Line Ins. Co. v. Farish,* 464 So. 2d 530, 532 (Fla. 1985).

This case presents a close question as to whether punitive damages should be awarded. Zimmerman's press release did not simply report the filing of a lawsuit and summarize court documents, but instead made inflammatory accusations about a competitor.  Nonetheless, while Zimmerman was clearly overzealous in making the accusations in the press release, I find his actions were not so egregious as to warrant punitive damages.

### 3.  *LCT tortiously interfered with MediaRECOVER's business relationships*

Under Florida law, a party bringing a cause of action for tortious interference with a business relationship must show "(1) the existence of a business relationship with another; (2) the defendant's knowledge of that relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) that the aggrieved party was damaged as a result of the defendant's interference." *Marquez v. PanAmerican Bank*, 943 So. 2d 284, 286 (Fla. 3d DCA 2006); *see also Border Collie Rescue, Inc., v. Ryan*, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006).  Corporate officers and directors may be liable in their individual capacities when they personally participate in the tortious interference with business relationships. *Special Purpose Accounts Receivable Co-op*

19

*Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1104–05 (S.D. Fla. 2000). The measure of damages for tortious interference differs from defamation. *See LRX,* 922 So. 2d at 986 ("The tort of intentional interference does not allow recovery for humiliation and embarrassment, mental anguish, and the like, as does the tort of defamation.").

The evidence shows that LCT and Zimmerman intentionally sent the press release or made other communications with MediaRECOVER clients in an effort to make the clients believe that MediaRECOVER was untrustworthy and to discourage companies from doing business with MediaRECOVER. The communications had the intended effect – MediaRECOVER lost business with Digital Innovations, Digital Workshop, and ProMaster. For the reasons stated above, however, MediaRECOVER has not proven damages with sufficient certainty except for the $7,500 ProMaster purchase order. *See St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So.2d 500, 505 (Fla. 5th DCA 2001) ("The speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship.").

### 4. *The publication of the press release constituted unfair competition*

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") declares unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Fla. Stat. § 501.211(2) provides that any person who has suffered a loss as a result of such practices may bring a private action for damages and attorney's fees as provided in § 501.2105.[17] A practice is unfair when it

---

[17] FDUTPA formerly provided that such actions could be brought by a "consumer" who has suffered a loss as a result of a violation, but since July 1, 2001, the language was broadened to "person." *See Furmanite America, Inc. v. T.D. Williamson, Inc.*, 2007 WL 1111254 at *10 (M.D. Fla. 2007). Courts have held that this broader language means the statute is not limited to consumer transactions. *See id.*

"'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers' (or competitors or other businessmen)." *See Day v. Le-Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988). The remedies in FDUTPA are "in addition to remedies otherwise available for the same conduct under state or local law." Fla. Stat. § 501.213(1).

I find that LCT engaged in unfair competition by issuing a false and defamatory press release about its competitor.[18] *See MJS Music Publ'ns, LLC v. Hal Leonard Corp.*, 2006 WL 1208015 (M.D. Fla. 2006) (where the plaintiff alleged that the defendant falsely claimed that the plaintiff had listed the defendant's copyrighted material on eBay, the court held that the plaintiff had sufficiently pled a violation under the FDUTPA); *Army Aviation*, 2007 WL 951804 at *4 (recognizing that a FDUTPA claim can arise "out of the identical transactions and occurrences that form the basis for Plaintiff's claim of common law defamation"). However, MediaRECOVER has proven no further damages under this count other than the damages discussed above.

*5. Civil conspiracy and concert of action count*

MediaRECOVER's third-party complaint also includes counts for "civil conspiracy" and "concert of action" against Zimmerman individually, based on Zimmerman's attempt to induce Grau to terminate Grau's license agreement with MediaRECOVER. Liability under a theory of concert of action requires cooperation in an underlying tort. *See Morton v. Abbott Lab.*, 538 F. Supp. 593, 596 (M.D. Fla. 1982) ("All those who, in pursuance of a common plan or design to commit a

---

[18] In the joint pretrial statement, MediaRECOVER seeks judgment against both LCT and Zimmerman on the unfair competition count. However, the amended third-party complaint against Zimmerman (doc. 88) does not include an unfair competition count against him. I therefore find that only LCT is liable for unfair competition.

tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify or adopt his acts done for their benefit, are equally liable with him.").  Likewise, to recover for civil conspiracy, a plaintiff must demonstrate, *inter alia*, a conspiracy between two or more parties "to do an unlawful act or to do a lawful act by unlawful means."  *Florida Fern Growers Ass'n, Inc., v. Concerned Citizens of Putnam County*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993).  There is no evidence that Grau cooperated with Zimmerman in the drafting and publication of the press release.  It is questionable whether the termination of a contract would constitute an unlawful act or tort that would create liability under the concert of action or civil conspiracy theories, but in any event, MediaRECOVER has not proven damages beyond those established for the underlying tort.

*C. Conclusion*

For the reasons stated above, I find that the Plaintiff has no basis for recovery from Defendant.  On the Defendant's counterclaims, I find that the Defendant has demonstrated that the publication of the press release constituted defamation per se, tortious interference with business relationships, and unfair competition.  Accordingly, the Clerk is instructed to enter judgment in favor of MediaRECOVER and against LCT and Zimmerman in the amount of $157,500.

DONE AND ORDERED at Tampa, Florida on July 3, 2007.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc:      Counsel of Record